**UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION**

UNITED STATES OF AMERICA,

    Plaintiff,                                    CASE NO. 05-CR-20052

v.                                              DISTRICT JUDGE THOMAS LUDINGTON
                                                  MAGISTRATE JUDGE CHARLES BINDER

ROBERT CHARLES TAYLOR,

    Defendant.

_____/

**MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION
ON DEFENDANT'S MOTION TO SUPPRESS**

**I.    RECOMMENDATION**

For the reasons set forth below, **IT IS RECOMMENDED** that the motion be **GRANTED.**

**II.    REPORT**

**A.    Introduction**

By order of U.S. District Judge Thomas L. Ludington, this motion was referred to the undersigned Magistrate Judge on October 16, 2006. (Dkt. 13.) Plaintiff filed a response opposing the motion (Dkt. 16), and both parties submitted supplemental briefs in accordance with this Court's direction at the conclusion of oral argument held on November 27, 2006. (Dkts. 18, 19.) Upon review, I conclude that pursuant to E.D. Mich. LR 7.1(e)(2), this motion is ready for Report and Recommendation.

**B.    Background Facts**

The search warrant serving as the basis for this motion was issued by Michigan District Court Magistrate Huffman on February 17, 2005 (Mot., Dkt. 12, Ex. A), as part of an investigation into a home invasion and larceny of an automobile which occurred in the Prudenville, Michigan area. The affiant, Detective Sergeant Tiepel ("Tiepel"), testified at the hearing that upon learning of a home invasion and

theft at 108 Bright Angel (Battani residence) on December 21, 2004, the "first ones [suspects] that came to mind were Richie Spear, Jr. ["Richie"] and Steven Spear."  (Dkt. 17, Tr. at 20, 53.)  Richie and Steven are brothers and were known in the community as having committed previous assaults and home invasions.  (Tr. at 20, 29, 53.).   The  area where the stolen vehicle was found and the victim's description of the perpetrator as being  5' 8" tall and young led Tiepel to think of the Spears as possible suspects.  (Tr. at 21.)  The victim, Mr. Battani, was never shown a photographic line-up to determine if he could identify the Spears brothers as the perpetrators.  (Tr. at 73.)  Tiepel testified further that the victim indicated several old family heirloom coins from Italy had been taken.  (Tr. at 26.)

On February 16, 2005, Tiepel was called to the State Police post at Houghton Lake because Richie Spear had been apprehended on a probation violation warrant.  (Tr. at 30-31.)  Detective Sergeant Lenhard ("Lenhard") of the Michigan State Police indicated that Richie Spear was "giving up, you know, information about the [Battani theft]."  (Tr. at 32.)  Richie Spear had told Lenhard that Stevie Spear and his cousin Danny Foster had committed the Battani theft.  (Tr. at 33.)  Tiepel testified that Lenhard told him that Richie Spear indicated the coins were sold to Defendant Taylor who is also known as "Nazi Bob" or "Machine Gun Bob."  (Tr. at 35.)  According to Lenhard, Defendant Taylor got that nickname because he collects World War II relics.  (Tr. at 108.)  Tiepel further testified that either Lenhard or Richie Spear described a six or seven by eight inch container that held old coins and that possibly some of the coins were of German origin.  (Tr. at 36.)

Tiepel visited Richie Spear in jail the next day and although Richie had not previously mentioned "how the coins got to [Defendant] Taylor," the next morning Richie indicated that his father Richard Spear Sr. had sold "those coins" to Defendant Taylor for "30, 40 bucks."  (Tr. at 37-38.)  When Tiepel asked Richie why he had not mentioned this the night before, Richie stated that he did not want to get his father in trouble.  (Tr. at 38.)  Similarly, Richie Spear initially indicated that he had not been present when the coins were sold, but at Tiepel's second interview he added that he was present, but stayed in the truck, when his father allegedly sold the coins to Defendant Taylor.  (Tr. at 64-66.)

2

Richie told Tiepel he wanted to "out" his brother and cousin, because he "didn't want to get pinned with it." (Tr. at 39.) No one attempted to speak with Richard Spear, Sr., however, to confirm or deny this information. (Tr. at 67.) At the suppression hearing, Richard Spear, Sr., denied ever possessing the coins taken from Battani's residence and denied ever selling any coins to Defendant Taylor. (Tr. at 86.) Richard Spear, Sr., also stated that he was never spoken to by the police regarding the Battani theft. (Tr. at 87.)

In August of 2006, Richard Spear, Sr., told the Federal Defender's Office investigator, Cameron Henke, that "his son 'Richie makes stuff up out of the blue.'" (Dkt. 12, Ex. F, ¶ 3.) Around this same time, Richie Spear indicated that when he provided information about his father selling coins to Defendant Taylor that "he was 'bull shitting' the police." (*Id.* ¶ 5.)   At the suppression hearing, Richard Spear, Sr. testified that his son Richie is "not really all there" and "makes up things a lot" but that he had told his son Richie that he "better be telling the truth in here [court]." (Tr. at 88.) Richie testified that the information he gave the police on the Battani theft was not true and that he was "fibbing them, telling a story . . . just telling them anything just to get myself out of trouble." (Tr. at 92.) The only way that Richie knew about the types of coins and other information was "[f]rom the detectives asking [him] about the coins." (Tr. at 92-93.) Richie repeated that the information he gave "was all a lie . . . just trying to save myself." (Tr. at 93.)[1]

Tiepel told Richie he couldn't "promise anything" in exchange for the information he provided about the Battani theft but that Tiepel would "mention it to the prosecutor." (Tr. at 74.) At the time, Richie was charged with fleeing and eluding. Tiepel stated that he did tell the prosecutor that Richie wanted some "leeway on the flee and elude" to which the prosecutor responded that he would need some "specific information" that was "truthful." (Tr. at 74.) Richie testified that he "didn't get no break" from the prosecutor's office but they "dropped it down to a misdemeanor . . . so, yeah, they didn't help me out none . . . they just wanted what they wanted to know and then that was it with me." (Tr. at 97.)

---

[1] At the time of his testimony, Richie indicated he had taken Oxycontin or Vicodin "about a day or two ago" because he "like[s] the buzz . . . the high." (Tr. at 94-95.)

3

When asked whether he was aware that giving false information to a police officer is a crime in itself, Richie responded that "[t]hat's not what I – that's not what I was told.  I was told you can lie all you want except for when you get to this place."  (Tr. at 98.)

Tiepel was aware of Richie's criminal record at the time of the warrant request, including home invasion, unlawfully driving away of an automobile ("UDAA"), and assault.  (Tr. at 68.)  In addition, Tiepel was aware that Richie had provided information regarding the robbery of a Shell gas station in Prudenville that was discounted as unreliable by Tiepel.  (Tr. at 69-70; Dkt. 12, Ex. E at 7.)[2]  Richie claimed to know who had perpetrated the robbery at the Shell gas station (Danny Foster's cousin), stated that the perpetrators had shown him items that were stolen, and told him how the robbery was committed when, in fact, the information he provided was incorrect.  (Tr. at 70-71; Dkt. 12, Ex. E at 7.)

Sergeant Lenhard testified that Richie's reputation among law enforcement people was such that "[e]verything Richie told me I'd look at with a jaundice[d] eye."  (Tr. at 103.)

Shortly after Lenhard arrested Richie and Richie began to implicate Defendant Taylor, Lenhard went to Defendant Taylor's house to ask him about the old or collectible coins that had been taken from Battani's home during the breaking and entering.  (Tr. at 104.)  Although Defendant Taylor was not really an informant for Lenhard, Lenhard indicated that Defendant Taylor had provided information to him in the past that helped solve some crimes.  (Tr. at 105.)  Lenhard had worked at the State Police post in Houghton Lake for 16 years and had known Defendant Taylor since early in his career there.  (Tr. at 107-08.)  When Lenhard worked with the Alcohol, Tobacco and Firearms unit ("ATF") approximately 12 years ago, Lenhard seized World War II rifles from Defendant Taylor's home.  (Tr. at 108.)  Lenhard indicated that most everyone in the community knows Defendant Taylor by his nickname and that Defendant Taylor has been published in books because of his collection of Nazi and World War II collectibles.  (Tr. at 109.)  Lenhard further testified that the whole Spears "clan" is "dysfunctional."  (Tr. at 110.)

---

[2]The Report is dated September 12, 2005, but is a narrative of events occurring exclusively in February of 2005 and culminating in requests for warrants.  (Dkt. 12 at Ex. E.)

4

Lenhard testified that, when asked about the coins, Defendant Taylor denied having the coins or knowing anything about them. (Tr. at 105.) Lenhard believed Defendant Taylor because he was "sure" that if Defendant Taylor had the coins, he would have given them to him. (Tr. at 105-06.) Lenhard clarified:

> If Bob Taylor said he doesn't have the coins, I would say, well it's probably a good chance that Bob doesn't have the coins. I think if – I think if Bob had the coins, he would give them to us. That doesn't mean I'd take it to the bank.

(Tr. at 111-12.) Further, Lenhard indicated that he told the Detective on the Battani case, either Wybraniec or Tiepel who had taken over for Wybraniec when Wybraniec was reassigned to road patrol, that "there's a real good chance that if Bob [Taylor] says he doesn't have the coins, then he doesn't have the coins" and "if Bob [Taylor] had the coins, I think he would have gave them to us." (Tr. at 112.)

Tiepel, on the other hand, believed Richie Spear because Riche was "real adamant" and the information Richie gave him was "consistent with what Mr. Battani" had said. (Tr. at 40.) Tiepel did not ask Richie to submit to a polygraph. (Tr. at 41.)

When Tiepel spoke to Defendant Taylor, Defendant was also "pretty adamant he had nothing to do with the coins." (Tr. at 42.) In addition, Defendant Taylor indicated that had he ever possessed coins with white supremacist or Nazi insignias or symbolism he would have remembered those coins and he did not. (Tr. at 63.) Tiepel "really had no reason not to" believe Defendant Taylor, but he talked to Richie Spear and then presented the following facts in support of probable cause, via affidavit, to the Michigan District Court Magistrate: (Tr. at 42-43):

   a.   That on November 11, 2004 Deputies Greiser and Richardson were dispatched to 108 Bright Angel, Prudenville, Michigan 48651 for a report of a home invasion and subsequent robbery from the residence, including the unlawful driving away of the owner's automobile.

   b.   That subsequent investigation revealed that a 52" Toshiba plasma television was taken.

   c.   That antique coins with insignias such as those described above, namely with white supremacy and Nazi markings, were stolen from the residence at 108 Bright Angel.

5

      d.      That Richard D Spear Jr states his brother Steven Spear and Cousin Daniel Foster committed the crime.

      e.      That Richard D Spear Jr was told by his brother Steven Spear that he did commit the crime with his cousin Daniel Spear.

      f.      That Richard D Spear Jr was present when Steven gave his father Richard D. Spear Sr the antique coins.

      g.      That Richard D Spear Jr went with his father Richard D Spear Sr to Robert Taylor's home as described above in paragraph one to sell the coins.

      h.      That Richard D Spear Jr observed the antique coins in a metal tin about five inches in diameter and about a foot tall.

      I.      That Richard D Spear Jr states his father sold the antique coins to Robert Taylor for $30-40.

      j.      That Richard D Spear Jr states the sale was about a month and a half ago.

      k.      That Richard D Spear states Robert Taylor collects antique coins, especially of German origin.

      l.      Affiant knows that coin collectors tend to secure and save collectable coins.

      m.      That Richard D Spear, Jr. Informed affiant that Robert Taylor collects these type of coins, and that Robert Taylor not [sic] have knowledge that these items were originally stolen and would therefore have no reason disposed of, or to have secreted, these items elsewhere.

(Def.'s Mot., Dkt. 12, Ex. A, ¶ 3.) The affidavit indicates that the property to be searched for and seized is:

> Antique coins, specifically those with an insignia related to white supremacy or Nazi symbolism, including coins related to the display of a human body shown in a hanged position. All items used to hold collector's coins, including a tin approximately 12" in height, round and of a dark brown color, but not excluding other boxes, tins, cases, or other containers that can be used to hold coins or currency. Also a red metal chest the shape of a treasure chest about 6-7" high and about 3" inches tall.

(*Id.* ¶ 2.) Tiepel testified that the specific descriptions of the coins was provided by Richie Spear. (Tr. at 46.)

      Mr. Battani testified that when he listed the items stolen from his home, he mentioned some Canadian, Italian and Spanish coins and a metal container, but had never owned nor did he report as

6

missing any Nazi, white supremacist or even German coins of any kind. (Tr. at 79.) Battani did not remember any officer asking him about the possibility of any German coins having been stolen. (Tr. at 84.)

The search warrant "Return and Tabulation," dated February 17, 2005, indicates that the following items were seized:

1. Colt police positive .38 spl serial #670621 blued w/ black grip - 5 rounds
2. Cimarron FA Co. .45 cal serial # P03433 - wooden grip - 6 rounds
3. Japanese 8mm pistol ser # 77111 w/ clip - 5 rounds
4. Mauser-Werke 8mm rifle ser # C17509
5. Mauser-Werke .22 lr rifle ser # 2554

(Def.'s Mot., Dkt. 12 at Ex. C.) None of the objects of the search, i.e., coins or chest container, were found at Defendant Taylor's residence. (Tr. at 47-48.) Defendant Taylor is currently charged with being a felon in possession of a firearm in violation of 18 U.S.C. § 922(g) and 924(a)(2).

**C.     Standard of Review**

The standard for reviewing the issuance of a search warrant was established by the Supreme Court: "[T]he duty of a reviewing court is simply to insure that the magistrate had a 'substantial basis for . . . conclud[ing]' that probable cause existed." *Illinois v. Gates*, 462 U.S. 213, 238-39, 103 S. Ct. 2317, 76 L. Ed. 2d 527 (1983) (quoting *Jones v. United States*, 362 U.S. 257, 271, 80 S. Ct. 725, 4 L. Ed. 2d 697 (1960)). Accordingly, Sixth Circuit precedent requires that a reviewing court pay "'great deference'" to a magistrate's findings of probable cause, "which 'should not be set aside unless arbitrarily exercised.'" *United States v. Leake*, 998 F.2d 1359, 1363 (6th Cir. 1993) (quoting *United States v. Pelham*, 801 F.2d 875, 877 (6th Cir. 1986)).

**D.     Probable Cause**

The Fourth Amendment of the United States Constitution provides:

The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

U.S. CONST. amend. IV. The probable cause standard is defined as "reasonable grounds for belief, supported by less than prima facie proof but more than mere suspicion." *United States v. Bennett*, 905 F.2d 931, 934 (6th Cir. 1990). The Supreme Court has found that probable cause to conduct a search exists when there is "a fair probability that contraband or evidence of a crime will be found in a particular place." *Illinois v. Gates*, 462 U.S. 213, 238, 103 S. Ct. 2317, 76 L. Ed. 2d 527 (1983). Thus, the affidavit supporting a search warrant need not establish beyond a reasonable doubt that incriminating evidence will be found at the place to be searched, but merely establish a fair probability. *See United States v. Savoca*, 739 F.2d 220, 224 (6th Cir. 1984).

Prior to 1983, a two-pronged test (known as the *Aguilar-Spinelli* test) was employed to determine whether probable cause to search existed. The first "basis of knowledge" prong required that the affidavit reveal how the informant came by his or her knowledge. *Spinelli v. United States*, 393 U.S. 410, 89 S. Ct. 584, 21 L. Ed. 2d 637 (1969). The second "veracity" prong required that the affidavit in support of the search warrant offer the magistrate a sufficient basis to conclude that the affiant's informant was trustworthy or reliable. *Id.* In *Illinois v. Gates*, however, the Court decided that the rigid two-pronged test must be abandoned in favor of a more flexible approach which would allow the magistrate to balance all factors presented in the warrant application. *See Gates,* 462 U.S. at 238.

The more flexible method adopted in *Gates* is a "totality of the circumstances" test using a "'practical, nontechnical'" approach. *Id.* at 230-31 (quoting *Brinegar v. United States*, 338 U.S. 160, 176, 69 S. Ct. 1302, 93 L. Ed. 1879 (1949)). Using this test, "a deficiency in one [prong] may be compensated for . . . by a strong showing as to the other, or by some other indicia of reliability." *Id.* at 233. Instances of "other indicia of reliability" can be found in Sixth Circuit case law. For example, in *United States v. Czyprynski*, 46 F.3d 560 (6th Cir. 1995), the court held that statements that are against the penal interest of the declarant bear "intrinsic evidence of credibility." *Id.* at 564-65. And in *United States v. Sonagere*, 30 F.3d 51 (6th Cir. 1994), the court found that statements based on first-hand observations are entitled to "greater weight than might otherwise be the case." *Id.* at 53.

8

"When the affidavit is based substantially on information provided by an informant, evidence of the informant's reliability, veracity, and basis of knowledge is highly relevant to the probable cause determination and may occasionally be critical." *United States v. Ketzeback*, 358 F.3d 987, 991 (8th Cir. 2004) (citations omitted)(confidential informant). Where the informant is a citizen informant or a non-professional, the corroboration or proof-of-veracity rules are generally relaxed:

> The lower courts have rather consistently held that the proof-of-veracity rules which obtain in informant cases are not applicable with respect to other sources of information. This result has been reached when the source of the information has been characterized as a 'victim' or 'eyewitness to the crime,' a 'citizen eyewitness,' 'complaining witness,' 'a cooperative citizen,' a 'concerned citizen,' 'an ordinary citizen,' 'an average citizen,' a 'citizen informant,' 'an informant not from the criminal milieu,' a 'citizen-informer,' or a 'nonprofessional informant.'

2 WAYNE R. LAFAVE, SEARCH AND SEIZURE: A TREATISE ON THE FOURTH AMENDMENT § 3.4 (4th ed. 2004) (citations omitted). Our sister circuit courts have followed this rationale as well:

> Courts are much more concerned with veracity when the source of information is an informant from the criminal milieu rather than an average citizen who has found himself in the position of crime victim or witness. . . . [T]he ordinary citizen who has never before reported a crime to the police may, in fact, be more reliable than one who supplies information on a regular basis. Basis of knowledge is likewise less of a problem in the victim-witness cases, for by definition the victim or witness is reporting first-hand knowledge.

*Easton v. City of Boulder, Colorado*, 776 F.2d 1441, 1449-50 (10th Cir. 1985) (quotations omitted).

A citizen informant's presumed credibility stems not only from the fact that he is not a professional informant or person interested in receiving some benefit by pointing to another, but also because the citizen eyewitness is "seldom involved with the miscreants or the crime." *United States v. Bell*, 457 F.2d 1231, 1238 (5th Cir. 1972); *United States v. Payne*, 341 F.3d 393, 401 (5th Cir. 2003) (reliability of an informant who is identified as a victim-witness to a crime, rather than a professional informant, need not be established in the officer's affidavit); *United States v. Campbell*, 732 F.2d 1017, 1018 (1st Cir. 1984) ("In substitution for a track record of reliability is the fact that he was not a professional informant, but a private citizen with no known criminal record or other criminal contacts, who came forward on his own. Under such circumstances, the informant's story may be more easily accepted."). A known informant is

9

also more inherently credible because he "could potentially be held accountable for providing false information." *United States v. Couch*, 367 F.3d 557, 560-61 (6th Cir. 2004).

In the instant case, I suggest that Richie Spear cannot be considered a citizen informant or a concerned citizen because of his criminal record and the fact that he was providing information with the hope of receiving leniency on his fleeing and eluding charge. (Tr. at 68, 74, 97-98.) Even assuming, *arguendo*, that he could be considered a citizen informant, I suggest that there were other circumstances which call his veracity into serious question, such that corroboration should have been sought before the warrant issued.

"[W]hen an average citizen tenders information to the police, the police should be permitted to assume that they are dealing with a credible person *in the absence of special circumstances suggesting that such might not be the case.*" *United States v. Fooladi*, 703 F.2d 180, 183 (5th Cir. 1983) (citations omitted) (emphasis supplied) (finding that where affidavit did not indicate that informant was a non-professional and did not give reasons why the informant was believed to be credible, the district court properly excluded the information furnished by the informant but reversing the district court's conclusion that the warrant failed to support probable cause without this information). *See also United States v. Burston*, 159 F.3d 1328, 1334 (11th Cir. 1998) (finding that close relationship with defendant and self-inculpating nature of informant's testimony did not undermine credibility where there was independent corroboration of certain key facts); *United States v. Paradis*, 802 F.2d 553, 558 (1st Cir. 1986) (informant's lengthy criminal record and mental illness history did not undermine probable cause finding because affiant corroborated information provided by informant).

When *United States v. Weaver*, 99 F.3d 1372, 1377 (6th Cir. 1996), held the day, the Sixth Circuit required courts to consider two factors when determining whether an informant's statement provided probable cause: "1) an explicit and detailed description of alleged wrongdoing, along with a statement that the event was observed firsthand, entitles [the informant's tip] to greater weight than might otherwise be

10

the case, and 2) corroboration of the tip through the officer's independent investigative work is significant."[3]

The Sixth Circuit modified *Weaver, supra,* in the *en banc* decision of *United States v. Allen*, 211 F.3d 970 (6th Cir. 2000). Although the factors set forth in *Weaver, supra* remain relevant to the "totality of the circumstances," they are not rigidly determinative. *Id.* at 974. The court noted that "[t]he affidavit is judged on the adequacy of what it does contain, not on what it lacks, or on what a critic might say should have been added." *Id.* at 975. "Consequently, an affidavit including a tip from an informant that has been proven to be reliable may support a finding of probable cause in the absence of corroboration. Alternatively, an affidavit that supplies little information concerning an informant's reliability may support a finding of probable cause, under the totality of the circumstances, if it includes sufficient corroborating information." *United States v. Woosley*, 361 F.3d 924, 927-28 (6th Cir. 2004) (citations omitted). *Accord United States v. Coffee*, 434 F.3d 887, 894-95 (6th Cir. 2006) (probable cause found where affidavit contained no averments that the confidential informant was reliable based on prior contacts because the affidavit did contain substantial independent police corroboration); *United States v. Jackson*, 470 F.3d 299, 307-08 (6th Cir. 2006) (probable cause found even though affidavit lacked any statements regarding confidential informant's reliability where affiant listened, via monitor, to transaction involving informant because the affidavit was based on the affiant's observations, not just hearsay of the informant).

Therefore, in *Allen*, the court held "that where a known person, named to the magistrate, to whose reliability an officer attests with some detail, states that he has seen a particular crime and particular evidence, in the recent past, a neutral and detached magistrate *may* believe that evidence of a crime will be found" without independent corroboration. *Id.* at 976 (emphasis in original).[4]

---

[3] Corroboration can be provided "by various means, including direct surveillance or circumstantial evidence, or [being] vouchsafed' by the affiant's statements about the informant's past performance." *United States v. Smith*, 182 F.3d 473, 478 (6th Cir. 1999) (quoting *United States v. Jordan*, 999 F.2d 11, 14 (1st Cir. 1993)).

[4] The court in *Allen* specifically noted cases from its own and other circuits where courts "rightly insisted upon substantial independent police corroboration, because of the absence of any indicia of the informants' reliability." *Id.* The cases cited, however, involved anonymous tips and the informant in *Allen, supra*, was a known,

Under *Allen* and its progeny, if an affidavit states nothing about the reliability of the informant[5] and lacks corroborating information, the warrant generally will be found to lack probable cause. *United States v. Hammond*, 351 F.3d 765, 773-74 (6th Cir. 2003) (finding probable cause lacking and distinguishing facts in *Allen* where affidavit did not state how long the officer had known the informant and corroboration was lacking because the officer's drive by merely confirmed the address and anonymous tips did not constitute sufficient corroboration).[6] *Accord Florida v. J.L.*, 529 U.S. 272, 274, 120 S. Ct. 1375, 1380, 146 L. Ed. 2d 254 (2000) (noting the importance of indicia of reliability even under the lesser standard of reasonable suspicion by concluding that "an anonymous tip lacking indicia of reliability . . . does not justify a stop and frisk whenever and however it alleges the illegal possession of a firearm.").[7]

"Sixth Circuit precedent clearly establishes that the affiant need only specify that the confidential informant has given accurate information in the past to qualify as reliable." *Greene*, 250 F.3d at 480. The converse is also logical, namely, that where no indication is made as to the confidential informant's past accuracy or other indicia of reliability such as corroboration, the affidavit fails to qualify. Here, the affidavit neglected to mention anything regarding Richie Spear's reliability, let alone any specific notation that he had provided accurate information in the past. (*See* Dkt. 12 at Ex. A.) It is possible that such attestation was omitted because the recent past information provided to law enforcement by Richie Spear was completely erroneous and unreliable. (Tr. at 69-71; Dkt. 12, Ex. E at 7.) Although law enforcement

---

albeit confidential, informant. *Id.* Thus, it is unclear whether the Sixth Circuit consistently distinguishes between anonymous and confidential but known informants.

[5]"[A]n affidavit need not name a confidential informant, but merely provide indicia of reliability. . . [such as] stating that the confidential informant had previously provided information leading to successful discovery." *United States v. Johnson*, 351 F.3d 254, 259 (6th Cir. 2003). The Court further noted that it is of no consequence whether the information led to arrests or convictions because the proper inquiry is whether the information provided was reliable rather than useful. *Id.*

[6]*Cf. United States v. Miller*, 314 F.3d 265, 270 (6th Cir. 2002) (holding that affidavit supported probable cause where known informant had seen evidence of crime in defendant's house within twenty-four hours of the issuance of the warrant even though the affidavit failed to provide any basis for known informant's credibility and informant had never provided information to the police in the past, citing *United States v. Pelham*, 801 F.2d 875 (6th Cir. 1986)).

[7]Cited with approval in *United States v. Greene*, 250 F.3d 471, 479 (6th Cir. 2001).

12

officials did not have the benefit of Richie Spear's own recent admission that he fabricated the whole story about his father selling coins to Defendant Taylor (Tr. at 92-93), they were aware of circumstances that call his reliability into serious doubt.

Tiepel and others were aware of Richie's track record of providing similarly false information regarding the perpetrators and the methods used to commit a robbery of the Shell gas station and they were also cognizant of his general reputation for being untruthful. (Tr. at 69-71, 88-93, 103.)  "The requirements of the Fourth Amendment [] insist 'upon substantial independent police corroboration' when there are doubts about an informant's reliability . . . ." *United States v. Mick*, 263 F.3d 553, 565 (6th Cir. 2001). The informant's lack of veracity is especially dangerous where, as here, the information he provided was not in addition to other evidence in the midst of an on-going investigation, it was essentially the only evidence to point to Defendant Taylor. *See United States v. Blount*, 123 F.3d 831, 835 (5th Cir. 1997) (finding known informant's tip sufficiently reliable without independent corroboration where "officers had no reason to disbelieve . . . or to question her motives or credibility" and where her statements were "solicited by the police" and they "fit into the *end* of an ongoing investigation, rather than prompting the beginning of a new one.") (emphasis in original).

Despite these red flags, no corroboration was attempted or presented to the issuing magistrate in the instant case. Furthermore, not only was there no corroboration made, but the evidence actually conflicted, i.e., the coins reported stolen were not the type of coins collected by Defendant Taylor nor did they match the description of coins sought in the affidavit. (Tr. at 46, 84; Dkt. 12 at Ex. A.) This failure is exacerbated by the fact that, unlike the informant, Defendant Taylor had a reputation for reliability that was communicated by Sergeant Lenhard to the affiant or his investigative predecessor. (Tr. at 105-06, 111-12.)

Accordingly, I suggest that probable cause was lacking and therefore, that the search warrant was defective and the fruits of the search pursuant to the warrant should be suppressed.

**E. Good Faith Exception**

I further suggest that the good faith exception should not be applied to save the warrant. The good faith exception was set forth in *United States v. Leon*, 468 U.S. 897, 922, 104 S. Ct. 3405, 82 L. Ed. 2d 677 (1984). It allows an otherwise deficient warrant to survive Fourth Amendment scrutiny except where: (1) the affidavit contains information that the affiant knows or should have known to be false; (2) the issuing magistrate wholly abandoned his or her judicial role; (3) the affidavit is so lacking in indicia of probable cause as to render belief in its existence entirely unreasonable or where the warrant application was supported by nothing more than a "bare bones" affidavit; or (4) the warrant is so facially deficient that the executing officers cannot reasonably presume it to be valid. *United States v. Van Shutters*, 163 F.3d 331, 337 (6th Cir. 1998); *United States v. Hython*, 443 F.3d 480, 484 (6th Cir. 2006). A "court reviewing an officer's good faith under *Leon* may look beyond the four corners of the warrant affidavit to information that was known to the officer and revealed to the issuing magistrate." *United States v. Frazier*, 423 F.3d 526, 536 (6th Cir. 2005).

Defendant contends that the first exception above applies and that the false statements and omissions contained in the affidavit necessitate the holding of an evidentiary hearing pursuant to *Franks v. Delaware*, 438 U.S. 154, 98 S. Ct. 2674, 57 L. Ed. 2d 667 (1978). (Dkt. 12 at 8.) In *Franks*, the Supreme Court set forth the threshold requirements for obtaining an evidentiary hearing on the validity of an affidavit in support of a search warrant:

> There is, of course, a presumption of validity with respect to the affidavit supporting the search warrant. To mandate an evidentiary hearing, the challenger's attack must be more than conclusory and must be supported by more than a mere desire to cross-examine. **There must be allegations of deliberate falsehood or of reckless disregard for the truth, and those allegations must be accompanied by an offer of proof.** They should point out specifically the portion of the warrant affidavit that is claimed to be false; and they should be accompanied by a statement of supporting reasons. Affidavits or sworn or otherwise reliable statements of witnesses should be furnished, or their absence satisfactorily explained. Allegations of negligence or innocent mistake are insufficient. **The deliberate falsity or reckless disregard whose impeachment is permitted today is only that of the affiant, not of any nongovernmental informant.**

14

*Id.* at 171 (emphasis added). The Court further explained that if these requirements are met, the probable cause determination then must be re-analyzed excluding the material that was allegedly false. If the warrant affidavit still contains sufficient content to support a finding of probable cause, no hearing is required. "On the other hand, if the remaining content is insufficient, the defendant is entitled, under the Fourth and Fourteenth Amendments, to his hearing. Whether he will prevail at that hearing is, of course, another issue." *Id.* at 172.

Plaintiff must make a "strong preliminary showing" that the affiant engaged in "deliberate falsehood" or "reckless disregard for the truth" in his inclusion of false facts or omission of critical information from the affidavit in support of a search warrant. *Hale v. Kart*, 396 F.3d 721, 736 (6th Cir. 2005), *citing Franks, supra*, *Mays v. City of Dayton*, 134 F.3d 809 (6th Cir. 1998), and *United States v. Atkin*, 107 F.3d 1213 (6th Cir. 1997). In *Hale, supra*, the court found that Plaintiff failed to provide any evidence of the affiant's intent to mislead, and the Plaintiff had not even argued that the omissions were critical to the finding of probable cause. However, the court admonished that it did "not foreclose the possibility that strongly material omissions could provide evidence of an intention to mislead." *Hale*, 396 F.3d at 727.

In the instant case, I suggest that the officer's failure to provide the issuing magistrate with sufficient grounds for probable cause constitutes negligence, but the *Franks* standard requires a showing of intentional or reckless disregard for the truth.[8] Therefore, I suggest that while the instant case is close, it is distinguishable from instances where that showing of deliberate falsehood has been made. *Hammond*, 351 F.3d at 774 ("There is no question that Officer Engle acted with reckless disregard for the truth in view of the remarkable inaccuracies presented in his affidavit.").[9] Instead, I suggest the instant case is

---

[8]Tiepel testified that he did not omit any items or distort the facts on the affidavit in any way. (11/27/06 Tr. at 10.)

[9]In *Hammond, supra*, the inaccuracies were as follows: Officer Engle ("affiant") stated that another officer had informed him that marijuana was located in a side room but the other officer did not recall making such a statement; the affiant stated he had verified the complaint or tip but in fact was not able to verify anything more than that the defendant's home address was correct; the affiant implied he had driven by the property closer in time to

more akin to *United States v. Tucker*, 188 Fed. Appx. 543, 2006 WL 1995747 (July 18, 2006 8th Cir.), where the court denied a *Franks* hearing because defendant failed to present evidence that omission of informant's mental illness and criminal record was made intentionally or with reckless disregard for the truth.

However, I suggest that the good faith exception may not be utilized in the instant case because of the third situation where application of the good faith exception is precluded: where the affidavit is so lacking in probable cause as to be considered a "bare bones" affidavit. The Government states that the "search warrant was admittedly 'bare bones.'" (Dkt 16 at 6.) However, since this is a legal conclusion, I suggest that the Government should not be held to that statement. *MacDonald v. General Motors Corp.,* 110 F.3d 337, 341 (6th Cir. 1997) (Defendant "counsel's statements dealt with opinions and legal conclusions, and we are thus reluctant to treat them as binding admissions."). However, I suggest that the Government's legal conclusion is correct.

"A bare bones affidavit is one that merely 'states suspicions, beliefs, or conclusions, without providing some underlying factual circumstances regarding veracity, reliability, and basis of knowledge.'" *United States v. McPhearson*, 469 F.3d 518, 526 (6th Cir. 2006) (citations omitted) (finding averments that defendant had crack cocaine on his person when he was arrested at his residence insufficient to establish probable cause to search his residence). Furthermore, the Sixth Circuit has explained that,

> [i]n our recent opinion in *Carpenter,*[10] we adopted the Fourth Circuit's understanding of the 'so lacking' language, ruling that the standard by which an affidavit should be judged for purposes of the good faith exception "'is a less demanding showing than the "substantial basis" threshold required to prove the existence of probable cause in the first place.'" *Carpenter,* 360 F.3d at 595 (quoting *United States v. Bynum,* 293 F.3d 192, 195 (4th Cir. 2002)). If good faith reliance were judged by the substantial basis standard, we observed, 'the exception would be devoid of substance.' *Id.*

---

the alleged date of the tip than he had; although the affiant stated there was no trailer on the property, there was; although the affiant stated there were no windows in the building, there were. The Sixth Circuit held that "the number of falsehoods and half-truths told are substantial and reflect, at the very least, a reckless disregard for the truth." *Id.*

[10]*United States v, Carpenter*, 360 F.3d 591 (6th Cir. 2004).

16

*United States v. Laughton*, 409 F.3d 744, 748 -749 (6th Cir. 2005) (footnote added).  I suggest that the instant affidavit was one "so lacking" probable cause as to be a "bare bones" affidavit that no reasonable officer could have relied upon in good faith.  As discussed earlier, the affidavit is devoid of any averments regarding the credibility or reliability of the informant, Richie Spear.  Whether this omission was purposeful because any mention of reliability would require disclosure of Richie's proclivity to lie and the past instance where he provided false information is not a determination that need be made under this exception.  Here, I suggest it is sufficient to note that the warrant suffers from the absence of any indicia of reliability of the informant and the lack of corroboration.  *Allen, supra; Hammond, supra; Mick, supra*.

Accordingly, I suggest that the motion to suppress be granted because the affidavit failed to provide probable cause and because the good faith exception cannot save a "bare bones" affidavit such as the instant one.

### III.   REVIEW

The parties to this action may object to and seek review of this Report and Recommendation within ten (10) days of service of a copy hereof as provided for in 28 U.S.C. § 636(b)(1).  Failure to file specific objections constitutes a waiver of any further right of appeal.  *Thomas v. Arn*, 474 U.S. 140, 106 S. Ct. 466, 88 L. Ed. 2d 435 (1985); *Howard v. Sec'y of Health & Human Servs.*, 932 F.2d 505 (6th Cir. 1991); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).  The parties are advised that making some objections, but failing to raise others, will not preserve all the objections a party may have to this Report

17

and Recommendation.  *Willis v. Sec'y of Health & Human Servs.*, 931 F.2d 390, 401 (6th Cir. 1991); *Smith v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987).  Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this Magistrate Judge.

                                                  s/ *Charles E. Binder*
                                                  CHARLES E. BINDER
Dated: February 6, 2007                            United States Magistrate Judge

## **CERTIFICATION**

I hereby certify that this Report And Recommendation was electronically filed this date, electronically served on James Brunson and Ken Sasse, and served on District Judge Ludington in the traditional manner.

Date:  February 6, 2007                    By     s/Jean L. Broucek
                                                         Case Manager to Magistrate Judge Binder